IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| C. MORROW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:21-CV-00721-DGK |
| | ) | |
| GUITAR CENTER STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S SUMMARY JUDGMENT MOTION**

This case arises out of Plaintiff C. Morrow's allegations that his employer, Guitar Center Stores, Inc. ("Guitar Center"), discriminated and retaliated against him in violation of the Missouri Human Rights Act, Mo. Rev. Stat. § 213.010, *et seq*. ("MHRA") based on his disabilities. Now before the Court is Guitar Center's Motion for Summary Judgment. ECF No. 24. For the following reasons, the motion is GRANTED.

**Summary Judgment Standard**

Summary judgment is appropriate if, viewing all facts in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Material facts are those facts "that might affect the outcome of the suit under the governing law," and a genuine dispute over material facts is one "such that a reasonable jury could return a verdict for the nonmoving part[ies]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the burden of showing a lack of a genuine dispute as to any material fact, *Celotex Corp.*, 477 U.S. at 323, and the Court views the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that

party's favor, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–89 (1986). To survive a motion for summary judgment, the nonmoving party must nonetheless substantiate his allegations with "sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (quotation omitted).

## Undisputed Material Facts

To resolve the motion, the Court must first determine the material undisputed facts. The Court has limited the facts to those that are undisputed and material to the pending summary judgment motion. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a). The Court has excluded legal conclusions, argument presented as fact, and proposed facts not properly supported by the record or admissible evidence. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a). Improperly controverted facts are also excluded from the record. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a). This includes instances were Plaintiff states a fact is "controverted" in his response yet fails to cite to particular materials in the record, or instances where he states a fact is "uncontroverted" but proceeds to give more unsupported information. For example, Plaintiff agrees he did not like working for a particular supervisor but goes on to say he "disliked working for [her] only after an incident in September of 2019 where [she] aggressively targeted [him], falsely claiming that people from four different departments told her that he was not working while he was assigned to bulk." Who were these people, and when did this happen? There is no citation to the record, and thus, this information is excluded.

With these limitations in mind, the Court finds the undisputed material facts to be as follows:

Plaintiff has Asperger Syndrome, bipolar disorder, irritable bowel syndrome, and anxiety disorder. Plaintiff states his disabilities cause him to use the restroom more frequently than others and prevent him from completing tasks as quickly as others.

On May 1, 2018, Plaintiff was hired by Guitar Center as a Shipping Associate at its Kansas City, Missouri warehouse. As part of his orientation, he received the Guitar Center Associate Handbook ("Handbook"). Plaintiff worked in the Case Seal department. Occasionally, Case Seal associates were required to help in other departments. When this occurred, managers would first take volunteers to help. If not enough associates volunteered, a rotation system was used.

One day in the fall of 2019 while Plaintiff was helping in the Bulk department, Bulk Supervisor Kaitlin Brown questioned Plaintiff and coworker Jeffery McEntire about not being productive workers in Bulk.[1] Brown's questioning angered Plaintiff, and so he reported Brown to his supervisor, Chris Thornhill, and Operations Manager James Rose. Plaintiff is unsure whether Brown was aware of his disabilities.

On October 21, 2019, Rose met with Plaintiff to discuss his productivity, specifically the large amount of time he spent off the floor during his shift. During this meeting, Rose asked Plaintiff if his lack of productivity had anything to do with him being sent to Bulk. Plaintiff indicated he did not like going to Bulk because of the "stunt" Brown pulled,[2] but never mentioned that Brown's stunt had anything to do with his disability.

Plaintiff also cites issues with Supervisor Bryan Shank. On an unknown date, Shank apparently told him, "You're a man, take it like a man" and "No, I control this conversation."

---

[1] In his response, Plaintiff states this fact is "uncontroverted" but clarifies that "Brown aggressively targeted [him], falsely claiming that people from four different departments told her that he was not working while he was assigned to bulk." Plaintiff does not cite to the record in support, and as such, the Court does not consider this information in its analysis. Pl.'s Resp. at 7, ECF No. 27.

[2] As best the Court can tell, this "stunt" refers to her questioning Plaintiff about his productivity in the fall of 2019.

3

Shank never made a comment regarding Plaintiff's disabilities though. But McEntire claims he personally observed Shank single out and bully autistic employees, including Plaintiff, in a harsh and disrespectful manner, albeit his affidavit provides no examples. McEntire also claims he saw other questionable conduct. For instance, he witnessed Rose and Thornhill stop Plaintiff from walking to and from the restroom—Plaintiff later told McEntire they were harassing him about his productivity and frequent trips to the restroom—and witnessed management call Plaintiff out for minor indiscretions, such as stepping out of the line on the floor, while other associates were not called out for doing the same thing. Plaintiff was never disciplined for his productivity, or lack thereof.

Beginning in the fall of 2019, numerous anonymous calls were made to Guitar Center's Navex EthicsPoint Hotline ("Hotline"). Director of Operations David Russell, Human Resources Manager Bridgett Mitchell, and other Human Resources personnel spent a significant amount of time and resources investigating every Hotline complaint. During this time, it was not uncommon to get a minimum of one Hotline call per week, but often two to three a night, from B shift—the shift Plaintiff worked. In comparison, there was typically only one Hotline call every six months from A shift during this time. Although Hotline calls are anonymous, Plaintiff admits to making more than ten calls, none of which referenced disability discrimination.

In addition to the Hotline calls, Plaintiff made numerous complaints to management and HR about his coworkers. Again, none of these complaints referenced disability discrimination. On December 26, 2019, Mitchell met with Plaintiff to discuss how things were going with him, and Plaintiff responded "everything was fine," "he didn't have any problems with anything," and that he felt comfortable talking to Mitchell or Rose if any issues arose.

4

On January 14, 2020, Russell and Mitchell met with Plaintiff and issued him a final written warning for making frivolous complaints about coworkers. The warning was given pursuant to Guitar Center's General Rules of Conduct policy that provides "willfully making knowingly false or malicious statements about fellow associates or the company" is an unacceptable activity. According to Guitar Center's discipline policy, "[a] violation of rules of behavior and codes of conduct will be addressed on an individual basis according to the facts of each case, and will be subject to appropriate disciplinary action." Df.'s Mot. at 9, ECF No. 24. Further, "[i]n some cases, an associate may be provided some form of warning so that he/she will have an opportunity to correct the problem. In other cases, disciplinary action, up to and including termination, may result for a first offense." *Id.*

On January 22, 2020, eight days after receiving the final written warning, Plaintiff contacted Human Resources Manager Ebony McKnight at Guitar Center's corporate offices in California. Plaintiff stated he is on the Autism spectrum and has anxiety problems and Asperger's Syndrome and is being discriminated against and subjected to a hostile work environment as a result of those disabilities. This was the first time Plaintiff complained of such. It was also the first time he told anyone at Guitar Center that he needed an accommodation. McKnight relayed the information to Human Resources Director Kristin Jaramillo.

On January 27, 2020, Mitchell and Rose met with Plaintiff to discuss his need for accommodations. Mitchell provided Plaintiff with a Disability Accommodation Letter ("Accommodation Letter"), with instructions to complete and return it by February 11, 2020.

On January 28, 2020, Nurse Practitioner Sarah Broughton completed and signed the Accommodation Letter indicating Plaintiff's disabilities and necessary accommodations, which Plaintiff then provided to Mitchell. Broughton indicated Plaintiff needed the following

5

accommodations: (1) close proximity to a restroom at all times; and (2) more time to finish tasks . . . and understanding that Plaintiff's production might fluctuate from day-to-day.

On January 31, 2020, Mitchell, Rose, and former HR Benefits Managers Asha Marshall and Claire Medina discussed the accommodations Broughton indicated were necessary. During the meeting, it was determined that additional information was needed from Plaintiff's medical provider regarding the accommodation that Plaintiff "needs more time to finish tasks." However, it was also determined that, despite the need for additional information, Guitar Center was "able to accommodate" Plaintiff.

Around the same time, a separate investigation ensued into an anonymous Hotline call made in February 2020. During that investigation, Mitchell and Rose received statements from multiple Guitar Center associates regarding Plaintiff's disturbing and threatening demeanor toward other associates. On February 4, 2020, Associate Erica Batton informed Mitchell that Plaintiff emailed Guitar Center Associate Amber Pilcher things she "might want to ask [Pilcher] about" (referring to the Avenging Angel stories as described below). Batton also provided a written statement claiming she was scared to "wand"[3] Plaintiff out as he left the warehouse one night, that Plaintiff makes her "very uncomfortable," and that she is "a little afraid of him."

The "Avenging Angel" stories are a series of extremely violent and sexual short stories Plaintiff authored. Plaintiff wrote them as a means of expressing his dark side because if he acted out the conduct he writes about, he would "end up in prison and [] ruin [his] life." Df.'s Mot. at 11, Ex. A, Morrow Depo. at 145:15–25. According to Plaintiff, "it's just [his] way of venting out the anger that [he] [has] towards those that prey on the week [sic] and innocent." Pl.'s Resp. at 14, Ex. A, Morrow Depo. at 146:3–5. In one story the character "Amber Winston" is raped by a

---

[3] Guitar Center does not define this term. As best the Court can tell, however, this is a security measure wherein a small scanner is moved around an employee to ensure they are not stealing.

6

serial rapist after leaving work, and Plaintiff's main character saves her from being further tortured. "Amber" has red hair and lip piercings in the story. Guitar Center claims this character is based on Pilcher—who has red hair, lip piercings, and the same first name—although Plaintiff claims this is coincidental. Plaintiff sent the Avenging Angel stories to Pilcher and several other Guitar Center employees, albeit he shared them outside the workplace and only after warning them about their graphic nature.

On February 5, 2020, Pilcher also provided a written statement regarding Plaintiff's behavior. She claimed Plaintiff "has been staring and glaring at me for a while now," elaborating that "[i]f [Plaintiff] is packing lanes or doing paperless, he will stare/glare at me as I walk to and from the bathroom. I look at the ground recently because I don't feel like I can look at anyone anymore because of this." Notably, while Plaintiff was initially friends with Pilcher, Plaintiff's demeanor toward her and other coworkers changed in the spring of 2019.[4]

On February 10, 2020, Pilcher told Mitchell and Rose she received the Avenging Angel stories from Plaintiff (from July 14, 2019, to September 1, 2019) but never read them. A coworker, Brendan Mitchell, had informed her about her resemblance to "Amber" in the stories.

On February 13, 2020, Russell and Mitchell met with Pilcher again and inquired if there were additional Avenging Angel stories she had not previously provided. She was able to locate 23 additional stories. Russell became concerned for Pilcher's safety after reading the stories.

Between February 13 and February 21, 2020, Guitar Center managers and supervisors exchanged three emails discussing Plaintiff's lack of productivity, an incident with another

---

[4] Guitar Center claims Plaintiff and Pilcher stopped speaking after Plaintiff asked her on a date and she rejected him. Plaintiff controverts this fact with another unsupported allegation, claiming that "[he] stopped speaking to Pilcher because of her involvement in that 'stunt' that Kaitlin Brown pulled." Pl.'s Resp. at 8.

7

coworker, and his restroom usage.[5] Guitar Center states it is common for managers and supervisors to send emails concerning store associates.

While Russell and Mitchell were investigating the Avenging Angel stories, Marshall and Medina continued processing Plaintiff's accommodation request. The two matters were handled independently of one another.

On February 17, 2020, Plaintiff's healthcare provider provided the additional information needed regarding his accommodations: an expectation that he attains 85% of production.

On February 24, 2020, Rose met with Plaintiff to review his requested accommodations. Plaintiff understood and agreed with the accommodations provided by Guitar Center and signed the Interactive Process Associate/Manager Meeting Summary indicating his agreement. Guitar Center provided Plaintiff with every accommodation his healthcare provider indicated he needed.

On February 25, 2020, Mitchell provided Jaramillo an update regarding her investigation into the Avenging Angel stories. She also provided information regarding additional concerns with Plaintiff's productivity and inappropriateness toward coworkers. For example, on February 19, 2020, Plaintiff's supervisor reported that he made a gesture toward a coworker as if he was choking the coworker.[6] On February 26, 2020, Mitchell sent the Avenging Angel stories to

---

[5] On February 13, 2020, Thornhill sent an email to Rose informing her that Plaintiff asked a coworker in the restroom if Voluntary Time Off ("VTO") would be called soon, to which the coworkers responded that is probably would, and Plaintiff went back into the stall and began unrolling toilet paper until VTO was called (although the timeframe Plaintiff remained in the stall was undetermined). Plaintiff was also seen using the front restrooms during production when the satellite restrooms were available. Then, on February 20, 2020, Rose sent an email to Russell, Thornhill, and Mitchell describing an incident where Plaintiff made gestures to other associates and was told to stop, and the incident was resolved. It is unclear in the email whether Rose observed this incident firsthand. Finally, on February 21, 2020, Thornhill sent an email to Russell, Mitchell, and Rose, alleging that at some point "last quarter" when they were very busy, Plaintiff was talking to other people in other departments and then went to the restroom.

[6] Plaintiff controverts making a choking gesture; however, he does not properly support his statement.

Jaramillo for review. After reviewing the stories, Jaramillo instructed Mitchell to terminate Plaintiff.

On February 26, 2020, Plaintiff was officially terminated for violating Guitar Center's Sexual Harassment policy. Guitar Center's Handbook prohibits discrimination in any form, including sexual harassment, "consider[ing] any form of discriminatory practices in the workplace to be unlawful, improper and unacceptable." According to the Handbook, sexual harassment includes, among other things, "sexually degrading or vulgar words or written descriptions of a person." The Handbook also provides that "[w]here harassment is found to have occurred, [Guitar Center] will take appropriate actions to remedy the situation."

On June 10, 2021, the Missouri Commission on Human Rights issued Plaintiff a Right-To-Sue letter. On August 17, 2021, Plaintiff filed suit against Guitar Center alleging disability discrimination/hostile work environment (Count I), and retaliation (Count II)—both in violation of the MHRA—and the case was subsequently removed.

**Discussion**

### I. Guitar Center is entitled to summary judgment on Plaintiff's disability discrimination claim (Count I).

Guitar Center argues it is entitled to summary judgment on Plaintiff's disability discrimination claim because Plaintiff suffered no adverse action and because his disability was not a factor in any alleged harassment. Plaintiff counters that the final written warning constitutes an adverse action, and his disability was a factor in his discrimination because he was targeted and singled out for his lack of productivity and time spent in the restroom—both side effects of his disability.

When analyzing disability-discrimination claims under the MHRA, federal courts "primarily apply Missouri law but may also apply federal employment discrimination law to the

9

Case 4:21-cv-00721-DGK   Document 30   Filed 03/15/23   Page 9 of 15

extent federal law is 'applicable and authoritative under the MHRA.'" *Heuton v. Ford Motor Co.*, 930 F.3d 1015, 1019 (8th Cir. 2019) (quotation omitted). The *McDonnell Douglas* burden-shifting framework applies. *See* Mo. Rev. Stat. § 213.101.3 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework, Plaintiff must first establish a prima facie case of discrimination. After doing so, the burden shifts to the employer to "articulat[e] a legitimate, nondiscriminatory reason for the adverse employment action. If the employer meets this burden, then the plaintiff has the burden to produce evidence that the proffered nondiscriminatory reason is a pretext for discrimination." *Heisler v. Nationwide Mut. Ins. Co.*, 931 F.3d 786, 794 (8th Cir. 2019).

To establish a prima facie disability-discrimination claim under the MHRA, Plaintiff must show that (1) he has a disability; (2) Guitar Center took adverse action against him; and (3) his disability was a "motivating factor" in the adverse action. *See* Mo. Rev. Stat. § 213.010(2); *Heuton*, 930 F.3d at 1019. "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. This might include termination, cuts in pay or benefits, and changes that affect an employee's future career prospects." *Charleston v. McCarthy*, 926 F.3d 982, 989 (8th Cir. 2019) (quotation omitted). "[M]inor changes in working conditions and no reduction in pay or benefits will not constitute an adverse employment action." *Id.* (quotation omitted); *see Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 671 (8th Cir. 2006) ("Mere inconvenience without any decrease in title, salary, or benefits" does not constitute an adverse action.). In certain circumstances, however, "lesser actions than demotion, suspension, and termination can be adverse employment actions if their cumulative effect causes an employee to suffer 'serious employment consequences' that adversely affect or undermine his position." *Charleston*, 926 F.3d at 989 (quotation omitted). "An employer is also liable for committing an

10

adverse employment action if the employee in need of assistance actually requested but was denied a reasonable accommodation." *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1060 (8th Cir. 2016).

Here, Plaintiff has failed to establish a prima facie case of discrimination. First, Plaintiff did not suffer an adverse employment action. The final written warning did not put Plaintiff at a material employment disadvantage—he was not terminated (at this point), subjected to a pay decrease, or otherwise materially affected. Further, the written warning did not change any of the terms or conditions of his employment; it simply instructed him on how to appropriately raise legitimate employment issues moving forward. Additionally, Plaintiff was never denied accommodation. *See id.* To the contrary, Guitar Center determined it would provide accommodations within days of Plaintiff's first request for accommodations.

Second, even if Plaintiff suffered an adverse action, there is no evidence his disability was a motivating factor. While Plaintiff contends his supervisors, namely Brown and Shank, continuously targeted him for his lack of productivity and frequent restroom usage, there is no evidence these individuals made comments or statements about his disability or treated him differently from other non-disabled coworkers. For instance, Brown questioned both Plaintiff and McEntire (who is not disabled) about their productivity, and there is nothing unusual about a manager questioning an associate's productivity. Plaintiff concedes Brown may have been unaware of his disability at that time, and Shank never made a comment regarding his disabilities. While McEntire claims in his affidavit that certain managers singled out Plaintiff, he never mentioned Russell or Mitchell—the two individuals who issued Plaintiff the final written warning. Thus, Guitar Center is entitled to summary judgment on Plaintiff's disability discrimination claim.

## II. Guitar Center is entitled to summary judgment on Plaintiff's hostile work environment claim (Count I).

Guitar Center agues it is entitled to summary judgment on Plaintiff's hostile work

environment claim because Plaintiff has not shown that the alleged harassment was sufficiently severe or pervasive enough to survive summary judgment. Plaintiff counters that he has provided adequate circumstantial evidence to prove a prima facie case of hostile work environment.

To establish a prima facie case of hostile work environment, Plaintiff must show: "(1) [he] is a member of a protected class; (2) [he] was subjected to unwelcome . . . harassment; (3) [his disability] was a [motivating][7] factor in the harassment; and (4) the harassment affected a term, condition, or privilege of employment." *M.W. by and through K.W. v. Six Flags St. Louis, LLC*, 605 S.W.3d 400, 409 (Mo. Ct. App. 2020). The fourth element is satisfied when the harassment "creates an intimidating, hostile, or offensive work environment or results in a tangible adverse employment action." *Id.* at 410. "The standard for proving this fourth element is demanding." *Id.* (citing *Watson v. Heartland Health Lab'ys., Inc.*, 790 F.3d 856, 861 (8th Cir. 2015)). To surmount this hurdle, Plaintiff must establish that the harassing conduct was "so intimidating, offensive, or hostile that it poisoned the work environment, and that the workplace was permeated with discriminatory intimidation, ridicule, and insult." *Watson*, 790 F.3d at 861 (internal quotation marks and citations omitted).

The harassment must meet this standard "both as it was subjectively viewed by [Plaintiff] and as it would be objectively viewed by a reasonable person." *Id.* at 861–62 (quotation omitted). Courts look to the totality of the circumstances when assessing the hostility of the environment and routinely grant summary judgment where a plaintiff fails to prove that the environment was objectively hostile. *See, e.g.*, *id.* at 862–63 (finding "a sexual touching, a single racial slur, four

---

[7] As is the case with the other causes of action, the motivating factor analysis applies to this claim because the lawsuit as well as the conduct at issue occurred after the effective date of the MHRA changing from a contributing to a motivating factor standard. *See R.M.A. by Appleberry v. Blue Springs R-IV School Dist.*, 568 S.W.3d 420, 425 n.3 (Mo. 2019) ("The applicable statute is typically the one in effect when the petition was filed.").

sexually degrading slurs, and a threat" over the course of ten working days was not objectively pervasive enough to constitute a hostile work environment claim); *Henson v. Union Pac. R.R. Co.*, 3 F.4th 1075, 1083 (8th Cir. 2021); *M.W. by and through K.W.*, 605 S.W.3d at 411–13.

Here, Plaintiff does not explicitly state what circumstantial evidence he relies on. As best the Court can tell, Plaintiff is referencing the fact he was questioned about his productivity a handful of times and reprimanded for filing frivolous complaints. These minor, and relatively few, disputes with his supervisors do not rise to the level of "severe or pervasive." *See Henson*, 3 F.4th at 1083; *Watson*, 790 F.3d at 862–63. Further, and as explained above, there is no evidence his disability was a factor in these disputes. Thus, Guitar Center is entitled to summary judgment on Plaintiff's hostile work environment claim.

### III. Guitar Center is entitled to summary judgment on Plaintiff's retaliation claim (Count II).

Guitar Center argues it is entitled to summary judgment on Plaintiff's retaliation claim because there is no causal relationship between his termination on February 26, 2020, and his complaint of discrimination and request for accommodations made on January 22, 2020. Plaintiff argues there is a causal relationship.

To present a submissible MHRA retaliation case, Plaintiff must prove "(1) he complained of discrimination; (2) [Guitar Center] took adverse action against him; and (3) a causal relationship existed between the complaint and the adverse action." *See Denn v. CSL Plasma, Inc.*, 816 F.3d 1027, 1036 (8th Cir. 2016) (citing *McCrainey v. Kansas City Mo. Sch. Dist.*, 337 S.W.3d 746, 753 (Mo. Ct. App. 2011)). As for the first element, the Missouri Supreme Court has explicitly held that "merely requesting an accommodation is insufficient to support a claim of retaliation under the plain language of the MHRA . . . ." *Li Lin v. Ellis*, 594 S.W.3d 238, 239 (Mo. 2020). As for the third element, "[s]ome examples for circumstantial evidence of causation include good work

13

record prior to the adverse employment action, close temporal proximity between the complaint and adverse action, atypical treatment, and facts showing the employer's explanation for the action is unworthy of credence." *McGaughy v. Laclede Gas Co.*, 604 S.W.3d 730, 752 (Mo. Ct. App. 2020). But "a plaintiff generally must present *more than a temporal connection* between protected activity and an adverse employment action." *Denn*, 816 F.3d at 1036 (internal quotation marks omitted). Indeed, "[a]s more time passes between the protected conduct and the retaliatory act, the inference of retaliation becomes weaker and requires stronger alternate evidence of causation." *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011).

Here, Plaintiff concedes "that he was retaliated against for complaining to HR that a coworker wasn't working[,] . . . [that] he was **not** retaliated against because of any complaint that he was being mistreated because of his disability," and "that the evidence that he was terminated in retaliation for requesting accommodations is the timing." Pl.'s Resp. at 19, Ex. A, Morrow Depo. 218:15–24, 233:1–12. Each of these reasons are insufficient to support a retaliation claim. *See Li Lin*, 594 S.W.3d at 239. Thus, to the extent Plaintiff relies on his request for accommodations to establish retaliation, which he primarily does in his briefing, his retaliation claim fails. *See* Plaintiff's Pl.'s Resp. at 28–30.

Even if Plaintiff argued that he was retaliated against for complaining of discrimination in his January 22, 2020, telephone call to HR, this argument fails as well. First, the temporal proximity between Plaintiff's complaint and his termination—nearly five weeks—is too remote. *See, e.g.*, *Corkrean v. Drake Univ.*, 55 F.4th 623, 632 (8th Cir. 2022) (temporal proximity of one-month was insufficient); *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) (temporal proximity of two weeks was "sufficient, but barely so"). Second, there is no evidence his termination bore any such connection to his complaint, as Guitar Center identified a "lawful

alternative explanation" for his termination—the Avenging Angel stories. *See, e.g.*, *Schottel v. Nebraska State Coll. Sys.*, 42 F.4th 976, 984 (8th Cir. 2022) (finding plaintiff's violation of school policy was a lawful alternative explanation for her termination); *Mitchell v. Kirchmeier*, 28 F.4th 888, 897 (8th Cir. 2022). The evidence demonstrates Guitar Center only began investigating the Avenging Angel stories after Batton brought the stories to management's attention during an independent investigation into an anonymous Hotline call. This investigation was entirely separate from Plaintiff's complaint of discrimination and request for accommodations. And after reviewing the Avenging Angel stories, Guitar Center realized Plaintiff had clearly violated its policy and terminated him. Guitar Center is, therefore, entitled to summary judgment on Plaintiff's retaliation claim.

## Conclusion

Plaintiff has failed to demonstrate he was discriminated against based on his disability, subjected to a hostile work environment, and retaliated against. Guitar Center's motion for summary judgment is GRANTED.

**IT IS SO ORDERED.**

Date:  March 15, 2023     /s/ Greg Kays
                          GREG KAYS, JUDGE
                          UNITED STATES DISTRICT COURT

15

Case 4:21-cv-00721-DGK   Document 30   Filed 03/15/23   Page 15 of 15